F I L E D
United States Court of Appeals
Tenth Circuit

DEC 8 2004

PATRICK FISHER
Clerk

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

MICHAEL G. LEE,

        Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

        Defendant-Appellee.

No. 03-7025
(D.C. No. 02-CV-229-P)
(E.D. Okla.)

ORDER AND JUDGMENT  *

Before **O'BRIEN** and **BALDOCK** , Circuit Judges, and   **BRORBY** , Senior Circuit
Judge.

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

---

\*     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff-appellant Michael G. Lee appeals from an order of the district court affirming the Commissioner's decision denying his application for Social Security disability and Supplemental Security Income benefits (SSI). Appellant filed for these benefits on January 13, 2000. He alleged disability since March 11, 1999, based on narcolepsy and depression. The agency denied his applications initially and on reconsideration.

On October 4, 2001, Mr. Lee received a de novo hearing before an administrative law judge (ALJ). The ALJ determined that appellant did not have a "severe impairment" as defined in the Social Security regulations, *see* 20 C.F.R. §§ 404.1521, 416.921, and was therefore not entitled to benefits. The Appeals Council denied review, making the ALJ's determination the Commissioner's final decision.

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *See Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir. 1989) (quotations omitted).

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 n.2. Here, the ALJ denied benefits at step two.

At step two, the agency determines whether the claimant's alleged impairment(s) are "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 416.920(a)(4)(ii), (c). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." *Id.* §§ 404.1521(a); 416.921(a). Only "slight" impairments, imposing only a "minimal effect on an individual's ability to work" are considered "not severe:"

> An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at [step two] when medical evidence establishes only a *slight abnormality or a combination of slight abnormalities* which would have *no more than a minimal effect* on an individual's ability to work even if the individual's age, education, or work experience were specifically considered[.]

Social Security Ruling 85-28, 1985 WL 56856, at *3 (emphasis added). *See also* SSR 03-3p, 2003 WL 22813114, at *2.

In light of these definitions, case law prescribes a very limited role for step two analysis. Step two is designed "to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory

-3-

definition of disability." *Bowen v. Yuckert*, 482 U.S. 137, 156 (1987) (O'Connor, J., concurring). *See also Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004). While "the mere presence of a condition or ailment" is not enough to get the claimant past step two, *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997), a claimant need only make a "de minimus" showing of impairment to move on to further steps in the analysis, *Langley*, 373 F.3d at 1123.

On appeal, Mr. Lee raises two issues. He argues that the ALJ failed to recognize his severe impairments, and that he failed to properly and fully develop the record. We reverse and remand for further proceedings.

1. **Narcolepsy and depression as severe impairments**

The ALJ concluded that "[t]he medical evidence of record establishes the existence of narcolepsy and dysthymic disorder." Aplt. App. at 22. The Merck Manual describes narcolepsy as follows: "A rare syndrome of hypersomnia with sudden loss of muscle tone (cataplexy), sleep paralysis, and hypnagogic phenomena." The Merck Manual of Diagnosis and Therapy 1413 (17th ed. 1999). The Merck Manual goes on to say that "the symptoms may put the patient in danger, often interfere with work and social relationships, and can drastically reduce quality of life." *Id.* at 1414. Mr. Lee's other mental impairment, dysthymia, is a sort of low-grade, long-lasting form of depression. *Id.* at 1538-39.

-4-

The agency regulations lay out the process for evaluation of mental impairments. *See* 20 CFR §§ 404.1520a; 416.920a. The agency is required "to consider . . . all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." *Id.* §§ 404.1520a(c)(1); 416.920a(c)(1). The claimant's impairment is then rated by its effect on four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3); 416.920a(c)(3). The ALJ is required to document his evaluation of these functional factors in the body of his decision, *id.* §§ 404.1520a(e); 416.920a(e), making specific findings as to the evidence relied upon and the degree of limitation in each of these areas, *id.* §§ 404.1520a(e)(2); 416.920a(e)(2).

The ALJ applied this four-part test to conclude that neither Mr. Lee's narcolepsy nor his dysthymic disorder, nor the combination thereof, was "severe" within the meaning of step two.[1] In fact, the ALJ found that Mr. Lee's mental conditions caused him *no* limitations in activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Aplt. App. at 22. In theory, this means that Mr. Lee can do any sort of work

---

[1] It might seem, at first glance, that "narcolepsy" is a physical, rather than mental condition. It is, however, listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) as a mental disorder. *See* DSM-IV-TR at 609-15 (4th ed. 2000).

available in the economy for which he is qualified, including driving a truck or working around machinery. The ALJ reached this conclusion, in spite of evidence that Mr. Lee's narcolepsy causes him uncontrolled bouts of sleepiness, *see id.* at 109 (report of Dr. Mynatt), and despite uncontroverted testimony from Mr. Lee that he had been fired from various jobs because he could not control the sleepiness his narcolepsy caused, *id.* at 164, and that he could not even cook at home for fear of starting a fire if he involuntarily fell asleep, *id.* at 168.

In reaching his conclusions, the ALJ did very little of the required mental impairment analysis, relying instead wholesale upon a psychiatric review technique (PRT) form completed by the agency's Dr. Kampschaefer, *see id.* at 117-30, and a one-page "medical consultant review form" completed by an agency medical consultant, *id.* at 116. An ALJ is bound by the opinions of agency medical consultants only insofar as they are supported by evidence in the case record. Social Security Ruling 96-6P, 1996 WL 374180, at *2. It follows that if the ALJ relies heavily on such opinions, as the ALJ did here, the opinions must themselves find adequate support in the medical evidence.

Dr. Kampschaefer did not examine Mr. Lee. He relied on an earlier examination by consulting physician Dr. Mynatt. *See* Aplt. App. at 109-10. In his PRT form, Dr. Kampschaefer focused primarily on Mr. Lee's diagnosis of dysthymia. *Id.* at 117, 127. He stated, incorrectly, that Mr. Lee had no history of

treatment or medication for his narcolepsy. *Id.* at 129. He also relied only on those portions of Dr. Mynatt's report favorable to the agency's position, ignoring Dr. Mynatt's detailed statements about Mr. Lee's narcolepsy and also his statement that Mr. Lee "has out of body experiences where he hears people talking and feels he should be part of the action but he is unable to participate." *Id.* at 109. Dr. Kampschaefer might, of course, have concluded that these statements were unworthy of belief, but there is no indication in his PRT form that he did or why he would have rejected them. Nor was Dr. Kampschaefer, who did not examine Mr. Lee, in a position to dispute conclusions that Dr. Mynatt reached based on examination.

There is also no discussion in Dr. Kampschaefer's report of Dr. Mynatt's conclusion that Mr. Lee's present Axis V LOF (level of functioning or global assessment of functioning score) is 48. *Id.* at 110. "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." *Langley*, 373 F.3d at 1122 n.3 (quotation omitted). The DSM-IV-TR, the diagnostic Bible of mental disorders, explains that a GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends,

inability to keep a job)." Diagnostic and Statistical Manual of Mental Disorders

34 (4th ed. 2000). [2]

Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work. *Eden v. Barnhart*, 109 Fed. Appx. 311, 314 (10th Cir. Sept. 15, 2004) (unpublished). The claimant's impairment, for example, might lie solely within the social, rather than the occupational, sphere. A GAF score of fifty or less, however, does suggest an inability to keep a job. *Oslin v. Barnhart*, 69 Fed. Appx. 942, 947 (10th Cir. July 17, 2003) (unpublished). In a case like this one, decided at step two, the GAF score should not have been ignored.

The other exhibit on which the ALJ relied, the one-page medical consultant review form, is essentially a check-off form where the medical consultant marks a series of boxes and provides a brief explanation of his conclusions. *See* Aplt. App. at 116. This court considers such forms of dubious value, when not accompanied by "thorough written reports or testimony." *Hamlin v. Barnhart*, 365 F.3d 1208, 1223 (10th Cir. 2004); *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) (quotations omitted). In sum, the opinions of Dr. Kampschaefer and

---

[2]    The ALJ's discussion of Dr. Mynatt's findings similarly omits any reference to the more serious statements in his report. Aplt. App. at 21. An ALJ may not simply pick out portions of a medical report that favor denial of benefits, while ignoring those favorable to disability. *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984).

the unnamed consultant are inconsistent with the medical evidence of record from examining source Dr. Mynatt, and the ALJ has failed to explain or to reconcile this discrepancy.

## 2. Development of the medical evidence

In his decision, the ALJ states "[t]his is a very thin medical exhibit file, and the claimant has never actually received any medical treatment for his allegedly disabling impairments." Aplt. App. at 21. This statement is troublesome, for two reasons. First, the ALJ made no effort to develop the medical record, even though there were ample clues that significant portions of it are missing and that these records would likely show that Mr. Lee did receive medical treatment for narcolepsy. Second, Mr. Lee explained at the hearing that he had not received medical treatment for financial reasons, not because he did not have a severe impairment. This triggered a duty on the part of the ALJ to determine whether financial reasons in fact explained Mr. Lee's failure to seek treatment, a duty the ALJ failed to discharge properly.

### a. Prior medical evaluation and treatment

Although Mr. Lee was evaluated by a Dr. Wiggs of Norman Neurology for narcolepsy in 1991 and 1992, and apparently received an EEG during that time period, the record does not contain any of Dr. Wiggs' records, other than three pages of billing records that do not include any pertinent findings or test results.

*Id.* at 101-03. We can tell from these billing records that Mr. Lee paid Dr. Wiggs over $300 for two evaluations and the EEG. Presumably, he received some sort of diagnostic results for this sum. The record contains nothing from Mr. Lee's chart, however, other than these bookkeeping records.

The absence of detailed records from Dr. Wiggs cannot be laid at the feet of Mr. Lee. By submitting the billing records, and through his testimony at the hearing, Mr. Lee alerted the ALJ to the missing records, and the need to obtain them to develop a complete record. At the hearing, in the ALJ's presence, Mr. Lee was asked:

> Q. Okay. As far as the narcolepsy, when were you first diagnosed with that?
>
> A. In '91.
>
> Q. Okay. . . . [W]ho diagnosed you? Which doctor?
>
> A. Dr. Wiggs.

*Id.* at 164-65.

The ALJ also asked Mr. Lee whether he was aware of the medications available for narcolepsy. He replied that he had been prescribed Ritalin, but the side effects bothered him. *Id.* at 171. Thus, the ALJ was made aware (1) that Mr. Lee had been diagnosed with narcolepsy, and (2) that he had been prescribed medication for it. Neither the diagnosis nor the prescription appears in the paltry medical evidence contained in the administrative record, however. This

-10-

undermines the ALJ's statements about the thin medical file and Mr. Lee's failure to seek treatment.

The ALJ has an affirmative obligation to develop the record by obtaining missing medical records that the claimant brings to his attention. *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996). The agency argues in its brief that the ALJ fulfilled this duty by ordering two consultative examinations, and by developing the records that date from the twelve-month period preceding the date of Mr. Lee's application (i.e., none). Each of these rationales is problematic.

First, consultative examinations are no substitute for records from a claimant's treating physician. The relevant statutes specifically provide that "[i]n making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) *all medical evidence*, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. § 423(d)(5)(B) (emphasis added). [3]

_____

[3] Since Dr. Wiggs saw Mr. Lee only a few times, and his records were nearly ten years old, it is possible that Dr. Wiggs was not Mr. Lee's "treating physician" within the meaning of the Act. *See Doyal v. Barnhart*, 331 F.3d 758, 762-63 (10th Cir. 2003) (discussing definition of "treating physician"). The ALJ did not rely on this rationale, however, and any findings necessary on this point can be made on remand. *See, e.g., SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)

(continued...)

Second, the "twelve month" rationale is not intended to preclude resort to pertinent evidence outside the twelve-month period, essential to a determination of disability. The statute says the Commissioner "shall develop a complete medical history of *at least* the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B) (emphasis added). If there is "reason to believe that development of an earlier period is necessary," the Commissioner should develop records pertaining to that period as well. 20 C.F.R. §§ 404.1512(d); 416.912(d).

The twelve-month rationale is entirely out of place in a case like this one where (1) the ALJ relies on the claimant's failure to seek treatment; (2) the ALJ relies on the lack of medical signs or findings to corroborate the claimant's assertions of a severe impairment; and (3) records that bear on the issue of disability from a doctor who may be claimant's treating physician are missing from the record. The ALJ's decision is filled with references to lack of medical evidence to substantiate Mr. Lee's claim of a severe impairment, each of which is valid only if this court ignores the ALJ's failure to develop the record and blinds itself to the evidence that Mr. Lee received an EEG study and medication for narcolepsy. The ALJ stated that "the claimant has never actually received any

---

[3](...continued)
(stating reviewing court should not make findings committed to agency).

-12-

medical treatment for his allegedly disabling impairments," Aplt. App. at 21; that "someone with a condition as severe and of such long duration as is alleged by the claimant would occasionally seek some medical care," *id.* at 22; that there are no "medical signs and findings" established by "medically acceptable diagnostic techniques" to support Mr. Lee's disability claim, *id.* at 23; and that Mr. Lee's statements concerning his impairments are not credible "in light of the absence of any medical treatment," *id.*

Admittedly, Mr. Lee did not receive any medical treatment after the alleged onset date. [4] Here, however, we run into a second, more serious problem. Small as it is, the record contains at least two references to Mr. Lee's inability to afford medical care. *See id.* at 109, 168. This provides an alternative explanation, other than lack of a severe impairment, for Mr. Lee's failure to obtain treatment.

### b. Failure to pursue medical treatment

In order to rely on the claimant's failure to pursue treatment as support for a finding of noncredibility, the ALJ should consider four factors: "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so,

---

[4] At one point in his decision, the ALJ did get it right. He limited his "lack of treatment" analysis to the time period following the alleged onset date. Aplt. App. at 22 ("To summarize, since the day that the claimant alleges that he became disabled, on March 11, 1999, he has never sought or received any medical treatment from anyone, for anything.").

-13-

(4) whether the refusal was without justifiable excuse." *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993). This analysis applies to cases in which the claimant fails to pursue medical treatment because he cannot afford it. *See id.* at 1489-90.

The ALJ stated in his decision in this case that "[t]he claimant has provided no persuasive evidence that he has been refused medical treatment or pain medication due to an inability to pay, or that he has sought alternative payment plans with any physician." Aplt. App. at 22. Here, the ALJ put the shoe on the wrong foot; it was *his* duty to inquire, as part of development of the record, whether Mr. Lee could in fact afford treatment and whether any alternative forms of payment were available to him. *See, e.g., Neil v. Apfel*, No. 97-7134, 1998 WL 568300, at **3 (10th Cir. Sept. 1, 1998) (unpublished) (citing *Thompson*, 987 F.2d at 1492). Mr. Lee testified that he had *no* income at the time of the hearing, and had had none since the last time he worked. Aplt. App. at 168-69. The ALJ later asked Mr. Lee if he had looked into places where he could get medical treatment free of cost; Mr. Lee stated he didn't know where to go for such services. *Id.* at 170.

Mr. Lee's only source of income was the interest he earned on his ten dollar savings account in the bank. Aplt. App. at 135. He lives at his mother's home. *Id.* at 168. He told Dr. Mynatt that he would like to have medical treatment but

-14-

neither he nor his family can afford it. *Id.* at 109. All the evidence in the record suggests that Mr. Lee is severely impoverished, and that he simply cannot afford treatment. Dr. Mynatt found that Mr. Lee was honest in giving information regarding his medical history, *id.* at 110, and Dr. Clark found him "reliable," *id.* at 104. There is no indication that Mr. Lee exaggerated his symptoms when he saw the two medical consultants.

It may be that upon a full consideration of all the vocational factors applicable in this case, the Commissioner would determine that Mr. Lee was not disabled. Here, however, the ALJ cut short the analysis, and made this determination at step two. He relied on impermissible factors in doing so.

The judgment of the district court is REVERSED and this case is REMANDED with instructions to remand to the agency for further proceedings in accordance with this order and judgment.

Entered for the Court


Terrence L. O'Brien
Circuit Judge