**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 28, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

WILLIAM C. PETREE,

　　　Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security Administration,

　　　Defendant-Appellee.

No. 07-5087
(D.C. No. 06-CV-96-SAJ)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **PORFILIO**, and **ANDERSON**, Circuit Judges.

---

　　　Plaintiff-appellant William Petree appeals from an order of the district

court affirming the Commissioner's decision denying his application for Social

Security disability and Supplemental Security Income benefits (SSI). He alleged

that his bipolar disorder and anxiety attacks have left him disabled and argues on

---

[*]　　　After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

appeal that the ALJ erred in (1) improperly evaluating his medically determinable mental impairments, (2) failing to properly evaluate a treating physician's medical opinion, (3) failing to properly evaluate the credibility of his testimony, and (4) improperly determining that he could perform his past relevant work. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), and we affirm.

I.

A. <u>Procedural History</u>

Appellant filed his applications for benefits on August 29, 2002. The agency denied his applications initially and on reconsideration. On November 18, 2004, appellant received a de novo hearing before an Administrative Law Judge (ALJ). Although Mr. Petree had originally alleged that he was disabled as of May 17, 2002, which was the date he was terminated from his last job, at the hearing he amended the alleged onset of disability date to December 1, 2003. The record shows that Mr. Petree has a history of alcohol abuse and, in informing the court of the amended date, Mr. Petree's attorney stated that "after [December 1, 2003, the] excessive alcohol use was over."[1] Aplt. App., Vol. 2 at 272.

Following the hearing, the ALJ determined that Mr. Petree retained the residual functional capacity (RFC) to perform sedentary, light, and medium

_____

[1] Mr. Petree admitted at the hearing that he had been aware that drinking negated the effect of the medications that he was taking.

exertional work with certain limitations.  The ALJ determined that Mr. Petree

was able to understand, remember, and carry out simple one-step instructions

with some more detailed instructions; to adapt to work settings; and to relate to

a small number of co-workers but not to the general public.  The ALJ found that

Mr. Petree could return to his past relevant work as a stocker, janitor, or house

cleaner and was therefore not disabled.  The Appeals Council denied review,

making the ALJ's decision the Commissioner's final decision.  Mr. Petree filed an

action with the district court appealing the denial of benefits.  The district court

affirmed.  Mr. Petree has appealed to this court.

B.  Treatment Medical Records

It is clear from the record that Mr. Petree has a long history of mental

impairment, stretching back over ten years prior to the ALJ's hearing.  It is also

clear that Mr. Petree has been able to work for much of this time.  The earliest

mental impairment diagnosis in the record is for major depression in 1993 while

Mr. Petree was a freshman in college.  In 1995 he was again diagnosed with

depression, but that diagnosis was subsequently changed to bipolar disorder.

Since 1995 his various mental health treatment providers have consistently

diagnosed him with bipolar disorder, with the later addition of an accompanying

diagnosis of an anxiety disorder.  This comports with Mr. Petree's testimony that

generally he experiences a manic phase in the spring of each year, which is

followed by a "plateau" during the summer and early fall, and then descends into depression from fall into winter, but that he also experiences panic attacks.[2]

The last job held by Mr. Petree required him to perform general labor and packaging duties. He held this job from August 1998 until May 2002, when he was terminated for excessive absences and tardiness. We note that all of the medical evidence specifically referenced by the ALJ in support of his decision, and by Mr. Petree in attacking that decision, dates from before Mr. Petree claims he became disabled. Of this evidence, the most relevant is obviously from after the date that Mr. Petree last worked and it is this evidence that we will examine in detail.

The first set of medical records from this period is from Grand Lake Mental Health Center (GLMHC), where Mr. Petree received treatment from July 2, 2002, until November 22, 2002. A clinician's note prepared by a Dr. Linda Evans on that date references the fact that he was recently fired from his job and states that he was off his medication because he could not afford it, that he could not sleep, that his anxiety and agitation had both increased, and that he had been destructive of property but not assaultive. The note went on to reference his long history of mental impairment and that he claimed that he had been an alcoholic since age nineteen.

---

[2] The record shows that Mr. Petree's depressive phase is generally more severe than his manic phase.

The next relevant document is a comprehensive assessment prepared by a licensed professional counselor on August 2, 2002. The mental status examination section of the assessment related that Mr. Petree had a sad mood and flat affect, problems with eye contact, and that he talked softly. It went on to state that Mr. Petree related feelings of hopelessness, helplessness, and worthlessness all the time and that he had difficulty with reduced thinking and ability to concentrate or focus. The examination stated that while his thoughts were clear, logical, and linear, his concentration, attention, social judgment, and insight were all poor.

On August 6, 2002, a physician's note from Dr. Richard Luc discussed a new medication regime but stated that Mr. Petree "appears, overall, stable with perhaps some more social phobia symptoms." Aplt. App., Vol. 2 at 146. On August 20, another note appears stating that Mr. Petree "says that he is feeling mild anxiety on occasion, but overall he does not feel bad," that "[h]e has noted no panics," and that he appeared "stable." *Id.* at 145. On September 3, 2002, another note from Dr. Luc states that Mr. Petree "denie[d] any current symptomatology." *Id.* at 142.

Dr. Luc then prepared a mental status form on September 23, 2002, which stated that Mr. Petree had "feelings of hopelessness, helplessness and worthlessness on a daily basis" and was "tired and fatigued daily." *Id.* at 141. He also found that Mr. Petree had "difficulty on a daily basis with reduced

thinking, and concentration/focus abilities." *Id.* He stated that Mr. Petree could "carry out simple instructions." *Id.* Dr. Luc finally found that Mr. Petree was being medicated and that the doctor expected to "level out [Mr. Petree's] moods, decrease depression and improve ability to think," and that while Mr. Petree's "response to work pressure, supervision and co[-]workers [was] below average [at that time]," it could improve with the medications. *Id.*

Dr. Luc's notes continue after the mental status form was prepared. A note dated October 1, 2002, shows that Mr. Petree reported that he was "still feeling down," mainly because he could not find a job and was having trouble sleeping, and further shows that a new medication was added to Mr. Petree's regimen. *Id.* at 140. A note on October 21, 2002, stated that Mr. Petree was "feeling better with the addition of [a new medication]" and that "[Mr. Petree] denies any difficulties. He has not needed to take the daytime [dose of the new medication] very[] much." *Id.* at 139. On November 18, 2002, Dr. Luc recorded: "[Mr. Petree] denies any difficulties on the current medications. He has used the [new medication] during the day when he is having 'panic' and it works fine." *Id.* at 138. Mr. Petree was discharged from the GLMHC where Dr. Luc worked on November 22, 2002, and began receiving outpatient treatment through Family & Children's Services (F&CS). *See id.* at 136, 165-80.

As noted by Mr. Petree in his appellate brief, his records from F&CS show that his "new psychological team" noted that he was "withdrawn and depressed,

-6-

and had poor decision making skills, moderately impaired judgment, and few intrapersonal relationships outside his supportive family." Aplt. Br. at 24. The records also contain the following notations: "[Client] unemployed & dependant on family for purchases of food, clothing & shelter," Aplt. App., Vol. 2 at 169; "[Client] reports tending to his own ADL's. Other needs are met by wife and [unintelligible]," *id*.; "[Client's] needs are met basically through wife & family," *id*. at 170; "[Client] mood & affect pleasant. Hygiene & grooming good. Dress casual. [Client] appears very passive & lacks motivation & a healthy sense of assertiveness. [Client] in need of counseling for self-esteem & improvement of motivation level," *id*. at 174. The mental status exam prepared at F&CS indicates that Mr. Petree was alert and oriented, had normal speech and facial expressions, intact and circumstantial thought processes, good insight, moderate judgment impairment, no memory impairment, appropriate social judgment, appropriate affect, an appropriate but withdrawn manner, and a normal but depressed mood. *Id*. at 175-76. The records also show that Mr. Petree was "very receptive to counseling/therapy & medication regimen," *id*. at 174, and that he was essentially prescribed the same medication regimen as he had been prescribed at the GLMHC. The last F&CS record is from January 16, 2003.

It appears that Mr. Petree sought no further mental health treatment until 2004. There is a January 2004 record from Christian Medical Clinic of Grand Lake that discusses Mr. Petree's history of bipolar disorder and notes that he had

lost his insurance and needed a refill of his bipolar medication. The record states that Mr. Petree "feels he is doing fairly well" but that he "gets manic in Spring [without his medication]." There is also a record from April 2004 from the same clinic that shows Mr. Petree returned for another prescription refill. That record shows that he reported "no new problems" and "no recent episodes of mania/depression." *Id.* at 239. The remaining records from the clinic simply note five more prescription refills through the end of 2004. No later treatment records were presented.

II.

A. <u>Standard of Review</u>

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *See Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir. 1989) (quotations omitted). "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

"The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. The claimant bears the burden

of establishing a prima facie case of disability at steps one through four." *Id.*

(quotations omitted).

> Step one requires the claimant to demonstrate that he is not presently engaged in substantial gainful activity. At step two, the claimant must show that he has a medically severe impairment or combination of impairments. At step three, if a claimant can show that the impairment is equivalent to [an impairment listed in 20 C.F.R., pt. 404, subpt. P., App. 1 (Listed Impairments)], he is presumed to be disabled and entitled to benefits. If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show that the impairment or combination of impairments prevents him from performing his past work.

*Id.* (citation and quotations omitted). If the claimant successfully establishes his prima facie case at steps one through four, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient RFC to perform work in the national economy, given his age, education and work experience. *See Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988). This case was decided at step four of the sequential analysis where the ALJ found that the mental impairment did not prevent Mr. Petree from performing his past relevant work.

III.

A. <u>ALJ's Step Two and Step Three Evaluation</u>

At step two, the decision found in Mr. Petree's favor that he had "an impairment or a combination of impairments considered 'severe.'" Aplt. App., Vol. 2 at 24. At step three, the ALJ determined that Mr. Petree's bipolar disorder

-9-

did not meet or equal the severity of an affective disorder at § 12.04 of the Listed Impairments. In particular, the ALJ found that Mr. Petree had not proven that he met the requirements of subsection B of § 12.04. Under that subsection, the ALJ was required to determine whether Mr. Petree's disorder resulted in at least two of the following:

> 1. Marked restriction of activities of daily living [(ADLs)]; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration[.]

Mr. Petree argues that the ALJ erred in determining that at least two of these requirements were not met.[3]

The ALJ first found that Mr. Petree had at most a moderate and not a marked restriction of ADLs. According to subsection C of § 12.00, "[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring

---

[3] We only consider the first three of the four domains. In his reply brief, Mr. Petree agrees that the record does not support a claim that he experienced repeated episodes of decompensation, each of an extended duration, and he withdraws that argument. Aplt. Reply Br. at 6.

appropriately for your grooming and hygiene, using telephones and directories, and using a post office." A "marked" limitation

> means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis.

*Listed Impairments*, § 12.00, subs. C. We agree with the magistrate judge that there is substantial evidence to support the ALJ's finding that there was no more than a moderate restriction of ADLs. There is much evidence in the record describing Mr. Petree's ability to groom himself, prepare meals, undertake various hobbies, and perform other ADLs, including evidence from Mr. Petree himself. The medical source opinions from medical consultants of the State agency also concluded only a moderate restriction was present. Mr. Petree argues that the ability to perform ADLs does not, by itself, prove that he is not disabled. *See Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) ("The sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity.") (quotation omitted). This is true, but irrelevant. At this step, we are concerned only with whether the evidence showing his ability to perform ADLs provides substantial evidence for the ALJ's finding that he was no more than moderately restricted *in his ability to perform ADLs*. It clearly does.

Similarly, we hold that there is substantial evidence to support the ALJ's finding that Mr. Petree had no more than moderate difficulties in maintaining both social functioning and concentration, persistence, or pace. The magistrate judge's analysis is cogent and persuasive when considering the sufficiency of the ALJ's findings regarding these requirements. We therefore affirm the ALJ's findings on these issues for the reasons set forth in the district court's March 28, 2007, opinion and order. While it is clear that there is evidence in the record, especially Mr. Petree's own testimony as to his limitations, that would support a finding of a more marked restriction, the ALJ is not required to discuss every piece of evidence, *Clifton*, 79 F.3d at 1009-10, and even if two inconsistent conclusions could be properly drawn from the evidence, this would not prevent a finding of substantial evidence, *Lax*, 489 F.3d at 1084.

Mr. Petree also argues that he had a medically diagnosed anxiety disorder and that the ALJ erred in (1) not determining whether it constituted a severe medical impairment at step two of the sequential evaluation, and (2) not determining whether, if severe, the mental impairment caused by his anxiety disorder was equivalent to a listed impairment. Any error that occurred was harmless.[4] Since subsection B of the anxiety related disorder section of the Listed Impairments–§ 12.06–is the same as subsection B of § 12.04, which was

---

[4] We do note that there are no records dated after the alleged onset of disability that show that Mr. Petree was still having anxiety attacks.

considered, the ALJ could not have found that Mr. Petree's mental disorder met or equaled the severity of § 12.06. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005) (holding that reversal is not required "where the ALJ's factually substantiated findings at steps four and five of the evaluation process alleviate *any* concern that [but for the error] a claimant might have been adjudged disabled at step three").

B.  ALJ's Evaluation of Treating Physician Opinion

Mr. Petree next argues that the ALJ failed to properly evaluate a treating physician's medical opinion and that the ALJ's RFC determination was inconsistent with that opinion. Specifically, Mr. Petree claims that the ALJ ignored the fact that Dr. Luc's September 23, 2002, mental status form stated that Mr. Petree could "carry out simple instructions." Aplt. App., Vol. 2 at 141. Mr. Petree argues that the RFC finding that, among other limitations, Mr. Petree was "able to understand, remember, and carry out simple one-step instructions and some more detailed instructions," was inconsistent with Dr. Luc's opinion as to the severity of his limitations. *Id*. at 24. He also argues that the ALJ failed to determine whether Dr. Luc's opinion should be given controlling weight and, if not, state what weight the opinion was being given.

It is true that

[w]hen evaluating the opinion of a treating physician, the ALJ must follow a sequential analysis. In the first step of this analysis, he should consider whether the opinion is well supported by medically

-13-

acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record. If the answer to both these questions is "yes," he must give the opinion controlling weight. But even if he determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must then consider whether the opinion should be rejected altogether or assigned some lesser weight.

*Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007) (citations omitted).

This precept provides no support for Mr. Petree's argument, however, because the opinion in question is an opinion as to Mr. Petree's mental status *fourteen months* before Mr. Petree claims he became disabled. As set forth in detail above, the administrative record includes later medical records from Dr. Luc, completed after he completed his mental status form, showing Mr. Petree's condition greatly improving, with the final records from Dr. Luc showing that Mr. Petree was reporting no symptoms from his disorders. Dr. Luc tendered no opinion on Mr. Petree's limitations as of the date that Mr. Petree claimed that he became disabled, because he had stopped treating Mr. Petree almost a year before.

Finally, the most recent consultative medical opinion in the record, from which the ALJ apparently took the limitation language in question, was prepared after Mr. Petree had ceased his treatment at GLMHC and F&CS. The RFC Assessment form in question was prepared by an agency medical consultant on February 18, 2003. It stated that Mr. Petree's ability to carry out very short and simple instructions was not significantly limited and that his ability to understand, remember and carry out detailed instructions was moderately limited. The

assessment was that Mr. Petree "[c]an perform simple [and] some more complex tasks." *Id*. at 183. Consequently, we hold that the ALJ's RFC finding that Mr. Petree was "able to understand, remember, and carry out simple one-step instructions and some more detailed instructions," *id*. at 24, was supported by substantial evidence.

C. ALJ's Evaluation of Credibility

In his third point on appeal, Mr. Petree claims that the ALJ erred in finding that his testimony was "not totally credible when considered in the light of all of the evidence of record." *Id*. at 22. The ALJ found that Mr. Petree's testimony regarding his inability to do any work was not entirely consistent with his work history showing that he worked from 1993 through 2002 despite the presence of a mental impairment, and that he continued to search for another job after being fired from his last one in May 2002. The ALJ also found that Mr. Petree's ability to provide for his own ADL's and the fact that he at times independently cared for his child was not entirely consistent with his claim that he could not perform even simple work. We affirm the ALJ's determination as to this point of error for the reasons set forth in the district court's opinion and order of March 28, 2007.

D. ALJ's Evaluation At Step Four

In his final point on appeal, Mr. Petree argues that the ALJ's step four determination that Mr. Petree could perform his past relevant work was not

supported by substantial evidence because it ignored two statements made by the VE at the hearing.

The first of these statements was made in response to the following question Mr. Petree's attorney asked the VE following the VE's testimony that Mr. Petree could perform his past relevant work. The attorney asked: "What affect would the [Global Assessment of Functioning] score 43 have on the jobs that you listed before?" *Id*. at 301. The VE answered: "Well, a person with a GAF of 43 couldn't function in the workplace." *Id*. Mr. Petree argues that since he had been tested at one point with a GAF of 43, this testimony shows he was disabled. We disagree.

First, a GAF score is not a one-time measure of a person's level of functioning that can be expected to remain constant. This fact is clearly evident from Mr. Petree's own case. For example, a record from 1993 shows that Mr. Petree was assigned a GAF score of 20-30 at that time. *Id*. at 210. But the same record also shows that he had received a GAF score of 60-70 within the past year. *Id*. A record from December 2001 shows a GAF score of 55-60. Later, a comprehensive assessment performed by GLMHC on August 2, 2002, rated Mr. Petree's GAF score as 43, but noted that his highest GAF score within the

past year was 50.  F&CS's records from January 2, 2003 contain this exact same scoring.[5]

Second, Mr. Petree's argument fails to acknowledge the fact that the latest GAF score in the record is from the second day of 2003, almost eleven months prior to the alleged onset date of disability and the record shows that Mr. Petree's GAF scores have fluctuated historically.

Finally, a low GAF score does not alone determine disability, but is instead a piece of evidence to be considered with the rest of the record.  *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."); *Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (unpublished) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work.").

The second statement by the VE that Mr. Petree alleges shows his disability was made during the following exchange at the hearing after Mr. Petree's attorney had referenced a number of limitations faced by Mr. Petree including moderate limitation maintaining concentration, persistence and pace.

---

[5]     A GAF rating between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation . . .) OR any serious impairment in social, occupational, or school functioning (e.g., . . . unable to keep a job);" whereas a GAF rating between 51 and 60 indicates moderate symptoms or impairments in these categories.  American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders at 34 (Text Rev. 4th ed. 2000) (emphasis omitted).

Attorney: "I'd like to know how these additional limitations would affect the jobs that you listed under hypothetical number one."

VE: "I think they were pretty much the same as the Judge had given me. It would limit him to simple, repetitive unskilled work but that didn't involve working around the public."

Attorney: "Okay, what about the restrictions to daily living and social functioning and concentration, persistence and pace though?"

VE: "Well, it would still be moderate. So I don't know that it has."

Attorney: "Would the combination of the three together have any affect on his ability to maintain work?"

VE: "Well, maybe the difficulties of maintaining concentration, persistence and pace might cause him to lose jobs."

Aplt. App., Vol. II at 299-300.

Mr. Petree essentially argues that in this exchange the VE reversed his previous determination that Mr. Petree could perform his past relevant work. We think that such an argument accords this exchange too much weight. A single unclear statement that "*maybe* the difficulties of maintaining concentration, persistence and pace *might* cause him to lose jobs," *id*. at 300 (emphasis added), following the VE's unambiguous testimony that Mr. Petree could perform his past relevant work, and two other statements that the moderate difficulties in maintaining concentration, persistence and pace would not have any

affect on that testimony, is not enough for us to say that the ALJ's step four determination was not supported by substantial evidence.

IV.

The judgment of the district court is AFFIRMED.

Entered for the Court


Stephen H. Anderson
Circuit Judge