**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 13, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TIMOTHY PISCIOTTA,

      Plaintiff-Appellant,

  v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

      Defendant-Appellee.

No. 05-3339

(D.C. No. 04-CV-2305-DJW)

(D. Kan.)

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

      The Commissioner has requested that we publish our prior order and judgment in this case, dated February 26, 2007. *Pisciotta v. Astrue*, 218 F. App'x 765 (10th Cir. Feb. 26, 2007). Upon consideration, the motion is granted. An opinion will issue superseding the order and judgment.

      Our prior mandate, issued April 20, 2007, is withdrawn. The attached opinion is substituted for the order and judgment entered February 26, 2007.

Entered for the Court,

Elisabeth A. Shumaker, Clerk

FILED
United States Court of Appeals
Tenth Circuit

February 26, 2007

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TIMOTHY PISCIOTTA,

      Plaintiff - Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

      Defendant - Appellee.

No. 05-3339

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 04-CV-2305-CM-DJW)**

---

James H. Green, Kansas City, Missouri, for Plaintiff - Appellant.

Christina Young Mein, Special Assistant United States Attorney, (Eric F.
Melgren, United States Attorney, with her on the brief), Kansas City, Kansas,
Frank V. Smith, III, Chief Counsel, Social Security Administration, for
Defendant - Appellee.

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

     Plaintiff Timothy Pisciotta appeals from an order of the district court

affirming the Commissioner's decision denying his application for Social Security

Disability and Childhood Disability Benefits. He filed for these benefits on

October 12, 2001, when he was 19 years old, alleging disability due to attention deficit hyperactivity disorder (ADHD), learning disability, oppositional-defiant disorder (ODD), depression, mild hearing loss, and knee-joint problems. The Social Security Administration denied his applications initially and on reconsideration.

On January 8, 2004, Mr. Pisciotta received a de novo hearing before an administrative law judge (ALJ), who determined that he retained the residual functional capacity (RFC) to perform medium work that "is simple, routine, and non-repetitive." R. Vol. II at 30. In addition, according to the ALJ: "The environment must be non-complex with no fixed quotas. [Mr. Pisciotta] can have no supervisory responsibilities and must be able to alternate sitting and standing." The ALJ also found that Mr. Pisciotta had no past relevant work to which he could return but that Mr. Pisciotta "could be expected to make a vocational adjustment to work that exists in significant numbers in both the local and the national economies." *Id.* at 31. As examples of such jobs the ALJ gave "duplicating machine operator, laundry folder, and microfilm mounter." *Id.* The ALJ concluded that Mr. Pisciotta was not disabled within the meaning of the Social Security Act. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision.

# I. STANDARD OF REVIEW

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *See Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir. 1989) (internal quotation marks omitted).

The Commissioner follows a five-step evaluation process to determine whether a claimant is disabled. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 n.2. If the claimant meets this burden, the burden shifts to the Commissioner at step five to show that the claimant retains sufficient RFC to perform work in the national economy, given his age, education, and work experience. *See id.* at 751.

The key issue in Mr. Pisciotta's applications for disability insurance (DI) benefits and childhood disability (CD) benefits was whether he was "under a disability" within the statutory definition. *See* 42 U.S.C. §§ 402(d)(1)(G), 423(a)(1)(E). The time period relevant to this evaluation differed between the two types of benefits that he sought. Mr. Pisciotta had received child's insurance benefits because of his mother's disability until April 2000, the month before the

3

month in which he celebrated his 18th birthday. Therefore, the earliest date on which he could receive CD benefits was May 1, 2000. As for DI benefits, he was first insured on his own account on April 1, 2000, and last insured on June 30, 2003.

## II. DISCUSSION

On appeal Mr. Pisciotta raises a single issue: whether the ALJ properly assessed his RFC. He complains that the ALJ unjustifiably rejected opinions expressed by his treating psychiatrist, Dr. Stanley, concerning his ability to work. Dr. Stanley stated his opinions in a letter dated September 21, 2001, and in a form entitled "Medical Opinion re: Ability to do Work-Related Activities (Mental)," completed January 17, 2004. R. Vol. II at 312.

In the September 2001 letter, Dr. Stanley noted that Mr. Pisciotta had been hospitalized several times at Two Rivers Psychiatric Hospital for reevaluation and medication adjustments. He had provided medications and family counseling to Mr. Pisciotta between these hospitalizations. From approximately June 2000 until March 2001, Dr. Stanley explained, Mr. Pisciotta was "out of treatment, grandiose, rebellious, living away from home and failing in all areas, including repeated job failures." *Id.* at 253. Since that time he had moved back in with his family, got back on his medication, and was "again making progress." *Id.*

But Dr. Stanley was less than sanguine concerning the nature of that progress. "If an examiner believed [Mr. Pisciotta's] grandiose self-assessment

4

and unrealistic future plans," he opined, "he would indeed look as though he were doing well." *Id.* "Actually," however, "he was not doing well." *Id.* Dr. Stanley noted that Mr. Pisciotta was in special-education classes, worked parttime in a family restaurant, was "socially inept," and had "poor hygiene." *Id.* He assigned him a GAF score of 45.[1]

The form that Dr. Stanley completed in January 2004 asked him to express an opinion on how Mr. Pisciotta's mental or emotional capacities were affected by his impairments. He was to rate Mr. Pisciotta's ability to perform certain activities, assigning them to one of four categories: "Unlimited or Very Good," meaning "Ability to function in this area is more than satisfactory"; "Good," meaning "Ability to function in this area is limited but satisfactory"; "Fair," meaning "Ability to function in this area is seriously limited, but is not precluded"; and "Poor or None," meaning Mr. Pisciotta had "[n]o useful ability to function in this area." *Id.* at 312. Dr. Stanley rated Mr. Pisciotta "good" in his ability to "[u]nderstand and remember very short and simple instructions"; "[c]arry out very short and simple instructions"; "[a]sk simple questions or

---

[1]     "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.' American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) [DSM-IV-TR] at 32. . . . A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as inability to keep a job. *Id.* [at 34]." *Langley v. Barnhart*, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004).

5

request assistance"; and "[b]e aware of normal hazards and take appropriate precautions." *Id.* at 313-14. He rated Mr. Pisciotta "fair" in his ability to "[r]emember work-like procedures"; "[m]ake simple work-related decisions"; "[r]espond appropriately to changes in a routine work setting"; "[d]eal with stress of semiskilled and skilled work"; and "[m]aintain socially appropriate behavior." *Id.* at 313-15. The rating that Dr. Stanley gave most frequently was "poor or none," rating Mr. Pisciotta at that level in his ability to "[m]aintain attention for two hour segment"; "[m]aintain regular attendance and be punctual within customary, usually strict tolerances"; "[s]ustain an ordinary routine without special supervision"; "[w]ork in coordination with or proximity to others without being unduly distracted"; "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms"; "[p]erform at a consistent pace without an unreasonable number and length of rest periods"; "[a]ccept instructions and respond appropriately to criticism from supervisors"; "[g]et along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes"; "[d]eal with normal work stress"; "[u]nderstand and remember detailed instructions"; "[c]arry out detailed instructions"; "[s]et realistic goals or make plans independently of others"; "[i]nteract appropriately with the general public"; "[a]dhere to basic standards of neatness and cleanliness"; "[t]ravel in unfamiliar place"; and "[u]se public transportation." *Id.* at 313-15.

Dr. Stanley's explanation of these ratings included the following

6

observations: Mr. Pisciotta was "quite immature and dependent." *Id.* at 314. Despite his use of Ritalin, he remained distractable. Tests performed in 1999 showed that he had a low ability to concentrate. He evidenced his immaturity by collecting children's Yu-Gi-Oh and Pokemon trading cards and having an unrealistic goal of attending wrestling school in California. He suffered from low self-concept, low self-confidence, and low motivation. With regard to Mr. Pisciotta's ability to work, Dr. Stanley noted that (1) he had never worked fulltime; (2) when he worked at a restaurant, he handled a reduced workload and was given fewer tables than normal to wait on; and (3) his service was "not outstanding enough to get big tips." *Id.* at 315. Dr. Stanley opined that Mr. Pisciotta's impairments or treatment would cause him to be absent from work "[m]ore than three times a month." *Id.*

When evaluating the opinion of a treating physician, the ALJ must follow a sequential analysis. In the first step of this analysis, he should consider whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (internal quotation marks omitted). If the answer to both these questions is "yes," he must give the opinion controlling weight. *See id.* But even if he determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must then consider whether the opinion should be

7

rejected altogether or assigned some lesser weight. The relevant factors are set forth in 20 C.F.R. §§ 404.1527 and 416.927. They include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1301 (internal quotation marks omitted).

The ALJ determined that Dr. Stanley's opinions were not controlling and entitled to little weight. He found the doctor's September 21, 2001, letter internally inconsistent regarding Mr. Pisciotta's status, explaining that "on one hand [Dr. Stanley] stated that [Mr. Pisciotta] was 'not doing well,' was socially inept, and demonstrated poor hygiene," yet Dr. Stanley "admitted that [Mr. Pisciotta] had made progress when he went back on medication and returned to his mother." R. Vol. II at 27.

"Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (citing 20 C.F.R. § 404.1527(c)). Although Dr. Stanley opined that Mr. Pisciotta was "not doing well," R. Vol. II at 253, the only specific factors he mentioned to support that conclusion were that he was "socially inept" and had "poor hygiene." *Id.* There was no indication of the severity of these factors or

how they would affect Mr. Pisciotta's ability to work. In fact, Dr. Stanley's letter cited mostly positive factors concerning his current level of adjustment, noting that he was doing well enough to live with his family, to work in a restaurant, and to attend school. Dr. Stanley did mention that Mr. Pisciotta worked only parttime and was in special-education classes, but it is unclear whether these should even be considered negative factors, because Dr. Stanley presented them in the context of positive developments (his renewed participation in work and school). Also, that his work was only parttime is unsurprising, given that he was still a high school student. Moreover, there is no explanation in the letter why Dr. Stanley assigned Mr. Pisciotta a GAF score of 45. On balance, we conclude that the ALJ permissibly assigned low weight to the unsupported and seemingly inconsistent opinions in this letter.

Turning to the ratings supplied in the form that Dr. Stanley completed in January 2004, the ALJ found the large number of "poor" ratings inconsistent with the remainder of the evidence, including the questionnaires accompanying the form and Mr. Pisciotta's experience at the Job Corps. As we have noted, to be entitled to controlling weight, an opinion must not be inconsistent with the other substantial evidence in the record. *See Watkins*, 350 F.3d at 1300. In determining the weight to be given an opinion, the ALJ must consider the consistency between that opinion and the record as a whole. *See* 20 C.F.R. § 404.1527(d)(4). The ALJ thus set forth a legitimate reason for assigning low weight to Dr. Stanley's

9

opinion, provided that his analysis is supported by substantial evidence in the record.

In our view, the record provides ample support. As the ALJ noted, over a period of years, from March 2001 to November 2003, Mr. Pisciotta and his mother completed questionnaires rating a variety of symptoms. These questionnaires asked them to rank his psychiatric and behavioral symptoms on a scale of 1 to 6; 1 being least and 6 being worst. None of the questionnaires contained a "6" rating, and the ALJ calculated that over 67% of the ratings were a "1," reflecting that the symptom posed no problem.

Also supporting the ALJ's analysis was an assessment at Pathways Community Behavioral Healthcare on September 15, 2000, during the period when Dr. Stanley described Mr. Pisciotta as "failing in all areas." R. Vol. II at 253. Mr. Pisciotta was diagnosed with ADHD by history, and history of major depression. *Id.* at 272. He was assessed as having mild to moderate problems with insight, a below-average intellect, and occasional inability to concentrate. Overall, the examiner, Julie Broyle, a licensed professional counselor, assigned him a GAF score of 65, which falls within the middle of the range indicating "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR, at 34.

10

In addition, on February 7, 2001, Ms. Broyle wrote a letter to the team at Mr. Pisciotta's high school in charge of assessing his special education needs. She noted her belief that he needed to work on social skills, increasing independence, and self-motivation and self-reliance, but that he "can perform at a higher level than he is currently." *Id.* at 236. She indicated that he was "helpful to others and has a good sense of humor," but would "need some extra help in particular academic areas as well as vocational training and guidance." *Id.*

In July 2001 Mr. Pisciotta received a psychological evaluation from Alan R. Israel, Ph.D. The opinions expressed in Dr. Israel's evaluation were considerably more detailed, thorough, and internally consistent than those contained in the letter and form completed by Dr. Stanley. Dr. Israel noted the considerable improvement in Mr. Pisciotta's ability to get along with his fellow students and teachers over the prior six months. He noted that Mr. Pisciotta had held the same weekend job for the last seven months and was looking for a second job during the week. Mr. Pisciotta's mother told Dr. Israel that although he had difficulty concentrating when not on his medication, and continued to have some difficulty sleeping and some mild anxiety, his behavior at home and at work was more appropriate than it had been in the past.

Mr. Pisciotta told Dr. Israel that he was "capable of grocery shopping, [was] learning to drive, [had] appropriate hygiene, [did] tasks around the house, and [could] follow work related instructions." *Id.* at 244-45. Mr. Pisciotta

11

presented himself at the interview with appropriate hygiene. He acknowledged becoming impulsive at times, being inattentive to details, and having trouble focusing, but stated that his medication helped to control these problems. Although Dr. Israel noted Mr. Pisciotta's previous psychiatric diagnoses, he gave him only a single current diagnosis: "Attention Deficit/Hyperactivity Disorder, combined type." *Id.* at 245. He observed that at the time of the examination, Mr. Pisciotta was "attending school full-time, working part-time, living at home with family, relating to friends, and engaging in normal teenage activities." *Id.*

One of Mr. Pisciotta's teachers noted in October 2001 that he needed "direct and constant supervision" and would "always need support on the job or in school," and was not capable of supporting himself at that time. *Id.* at 138. But another teacher stated at the same time that she had seen him mature greatly during the previous four years. The notes on Mr. Pisciotta from the Pathways program showed considerable improvement in his ability to cope with life. His discharge summary from Pathways in August 2003 noted mixed progress overall, with Mr. Pisciotta having maintained longterm, parttime employment, graduated from high school, and become independent in major life areas, but still very dependent on others for daily living. When he worked in the Job Corps, he did not request any accommodation

12

In sum, the record provides substantial evidence to support the ALJ's evaluation of Dr. Stanley's opinions concerning Mr. Pisciotta's RFC. The judgment of the district court is therefore AFFIRMED.