**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 5, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JOSE U. GONZALEZ,

        Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant-Appellee.

No. 09-1205
(D.C. No. 1:07-CV-02342-RPM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY, PORFILIO,** and **O'BRIEN**, Circuit Judges.

---

Jose U. Gonzalez appeals from a judgment of the district court affirming

the Commissioner's denial of his application for Social Security disability

benefits and supplemental security income payments. Exercising jurisdiction

under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. Background

On December 8, 1998, while working for a cleaning service stripping floors, Mr. Gonzalez slipped on a wet surface and fell to the ground, sustaining a blow to his right temple. He claims he has been unable to work since this accident due to the residual effects of his head injury. Specifically, he claims that he suffers from intense, throbbing headaches; memory loss; anxiety; depression; neck pain; jerking spasms on the left side of his body; and humming in his ears. In addition, he has Type II diabetes and suffers from occasional numbness and tingling in his legs and feet. In October 2004 and January 2005, he filed applications for disability insurance benefits and supplemental security income payments based on these conditions. The applications were denied at the initial stage, and Mr. Gonzalez was granted a hearing before an administrative law judge ("ALJ"), which took place on May 7, 2007.

The ALJ heard testimony from Mr. Gonzalez, his son, Tyson, and a vocational expert ("VE") before concluding at step five of the sequential evaluation process, *see* 20 C.F.R. § 404.1520(a)(4); *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009), that Mr. Gonzalez was not disabled within the meaning of the Social Security Act. The ALJ agreed that he suffered from a number of severe impairments possibly stemming from his accident, including a mild closed-head injury; neck pain; post-traumatic headaches; and cognitive, mood, anxiety, and chronic pain disorders. But the ALJ found that despite these

impairments, Mr. Gonzalez retained the residual functional capacity ("RFC") to perform a reduced range of unskilled light work. He offered as examples the jobs of cafeteria attendant and cleaner/housekeeper, which the VE testified exist in significant numbers in the national and regional economies.

In reaching this conclusion, the ALJ considered seven years' worth of medical records, which had been amassed in part to support Mr. Gonzalez's claim for workers' compensation benefits. Hence, the ALJ had the benefit of numerous opinions from doctors and psychologists concerning the precise question of Mr. Gonzalez's ability to work, albeit under a different legal framework than the Social Security Act. There is a difference of opinion among Mr. Gonzalez's doctors concerning the residual effects of his head injury, which the ALJ acknowledged. The judge concluded, however, that the opinions most supportive of Mr. Gonzalez's disability claim were entitled to little weight because he found them to be inconsistent with the objective medical evidence and the record as a whole. The crux of Mr. Gonzalez's appeal challenges this determination. He also takes issue with the ALJ's credibility analysis and treatment of the VE's opinion. We address his arguments below.

## II. Discussion

In reviewing the ALJ's decision, we ask only whether "the factual findings are supported by substantial evidence" and "whether the correct legal standards were applied." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008)

(quotation omitted). In making these determinations, "we will not reweigh the evidence or retry the case." *Wall*, 561 F.3d at 1052 (quotation omitted). Our role is to "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings[,] in order to determine if the substantiality test has been met." *Id.* (quotation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Id.* (quotation omitted).

## A. The ALJ's Rejection of Dr. Hall's Opinion

Mr. Gonzalez complains that the ALJ unjustifiably rejected opinions expressed by Dr. Timothy Hall, an independent medical examiner for the State of Colorado who evaluated Mr. Gonzalez in connection with his workers' compensation claim. Dr. Hall's notes from two examinations, in June 2002 and September 2004, constitute the primary evidence in support of Mr. Gonzalez's claim. During those exams, Mr. Gonzalez complained of memory loss, throbbing headaches, and a humming in his ear. Dr. Hall found him to be both pleasant and believable, but he noted that Mr. Gonzalez was "slow to respond" and "seem[ed] a bit distant." Admin. R. at 284. He also noted that Mr. Gonzalez was easily confused and provided "wandering" answers to his questions. *Id.* Dr. Hall diagnosed Mr. Gonzalez with a mild traumatic brain injury with probable visual and cognitive dysfunction, post traumatic headaches, and myofascial pain of the

-4-

cervicothoracic area. He acknowledged that these diagnoses conflicted with other opinions in Mr. Gonzalez's records. But Dr. Hall believed the "marked change in [Mr. Gonzalez's] functional status" following a significant blow to the head to be more than a mere coincidence. *Id.* And he noted after his second examination that despite the "difference of opinion between providers about [Mr. Gonzalez's] closed head injury diagnosis," he was "fairly convinced" that Mr. Gonzalez had such an injury and "continue[d] to suffer from consequences of it." *Id.* at 280.

This opinion conflicts with earlier opinions from Drs. John Tyler, Michael Schmidt, and Zvi Kalisky. Dr. Tyler first met Mr. Gonzalez in August 2001. He was sufficiently concerned with Mr. Gonzalez's inability to concentrate during the exam that he sent him for a psychological evaluation with Dr. Schmidt in December 2001. Dr. Schmidt submitted Mr. Gonzalez to a series of cognitive tests. He concluded that the results "[did] not reflect normal functioning" but also that they were "not a perfect fit for residual effects of [a] mild closed head injury." *Id.* at 147. He did allow it was possible Mr. Gonzalez was experiencing residual head injury symptoms.

In January 2002, however, after conferring with Dr. Tyler and reviewing additional medical records, Dr. Schmidt changed his mind due to inconsistencies in Mr. Gonzalez's case. Specifically, Dr. Schmidt noted that despite regular check-ups after the accident, Mr. Gonzalez did not complain of cognitive symptoms until over nine months later—at a time when most patients would have

-5-

fully recovered from a mild head injury. Dr. Schmidt observed that if Mr. Gonzalez's "symptoms were bad enough to be reported nine months post injury, they would have been considerably worse earlier on and would very likely have been cause for significant concern." *Id*. at 150. He also noted that Mr. Gonzalez had been inconsistent in reporting whether he had lost consciousness when he fell. Two days after the accident, he told his treating physician, Dr. Patrick Higgins, that he had not lost consciousness, but he later told Dr. Schmidt that he had lost consciousness. Based in part on the new information, Dr. Schmidt determined that the neuropsychological evaluation he conducted was "substantially influenced by inconsistent test-taking effort" and was therefore unreliable. *Id.* at 151. He therefore concluded that Mr. Gonzalez was not suffering from any residual effects of a closed head injury, an opinion that was shared by Dr. Tyler.

Dr. Kalisky's opinion is also in accord with this conclusion, although he did not personally examine Mr. Gonzalez. Upon reviewing the claimant's medical file, Dr. Kalisky concluded that his subjective complaints were not "substantiated by objective physical, radiological, or electrophysiological findings." *Id.* at 124. Dr. Kalisky found "no objective medical reason which would preclude [Mr. Gonzalez] from working . . . full time, without restrictions." *Id.* at 127.

The most voluminous records are from Dr. Jeffrey Jenks and Dr. Glenn Kaplan, who treated Mr. Gonzalez in tandem throughout 2004. In January of that year, Mr. Gonzalez saw Dr. Jenks for headaches, cognitive difficulties and neck pain. Dr. Jenks noted that his patient presented with questionable symptoms related to a head injury and probable depression. He prescribed physical therapy and referred Mr. Gonzalez to Dr. Kaplan for psychological treatment. Upon meeting Mr. Gonzalez, Dr. Kaplan noted that although he had seen other psychologists, Mr. Gonzalez had yet to receive any treatment beyond testing. In January 2004, he diagnosed Mr. Gonzalez with a pain disorder and unspecified cognitive and anxiety disorders. After four additional sessions with Mr. Gonzalez, Dr. Kaplan concluded that he did "not appear to have any permanent psychological problems related to his work injury." Admin. R. at 213. In March 2004, he remarked that Mr. Gonzalez was "motivated to return to work," but was not sure he would be able to do construction-type work. *Id.* at 214. During their last session, Mr. Gonzalez reported he was thinking about looking for a job. Throughout his treatment with Dr. Kaplan, Mr. Gonzalez reported that his headaches, mood swings, and anxiety were all improving.

Dr. Jenks's treatment records reflect similar improvement. After his course of physical therapy, Mr. Gonzalez demonstrated an increased cervical range of motion and reported that he was in less pain. Based on a Functional Capacity Evaluation ("FCE") completed on April 19, 2004, the physical therapist placed

Mr. Gonzalez in the light-medium work classification and noted in a letter to Dr. Jenks that he was able to work an eight-hour day. Dr. Jenks fully endorsed this FCE in June 2004, noting that in his opinion, Mr. Gonzalez was "in the light/medium work category." *Id.* at 265.

There is a lone entry in Mr. Gonzalez's medical records from Dr. Anthony Ricci, a psychologist, whom he saw in January 2003. According to Dr. Ricci, Mr. Gonzalez was "manifesting very evident features of [p]ost-[c]oncussion sequelae;" was "clearly moderately to severely dysfunctional; and . . . unable to sustain consistent employment." *Id.* at 202. He diagnosed chronic pain syndrome and mood disorder, and "strongly endorse[d]" the treatments recommended by Dr. Hall. *Id.* The ALJ gave this opinion little weight, emphasizing that it came from an examining, not a treating source, and that it was inconsistent with the opinions of Mr. Gonzalez's treating physicians. He also noted that the ultimate issue of a claimant's ability to work is reserved to the Commissioner. *See Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

As for the weight given to Dr. Hall's opinion, we have held that "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) (internal quotation marks omitted). And we have reminded ALJs that in determining how to weigh an opinion, they "must consider the consistency

between that opinion and the record as a whole." *Id.* In rendering his opinion, Dr. Hall intentionally departed from the opinions of Dr. Tyler, Dr. Schmidt, and Dr. Kalisky. But the ALJ was not persuaded, noting that Dr. Hall's opinion was not supported by the treatment records or the examination findings; was inconsistent with other more persuasive medical opinions in the record, including the later opinions by Mr. Gonzalez's treating physicians; and was inconsistent with the results of the functional capacity evaluation. We see no error in the ALJ's treatment of Dr. Hall's opinion. Taken as a whole, we agree with the ALJ's assessment of the medical evidence and conclude it does not support a claim of total disability under the Social Security Act.

### B.   The ALJ's Credibility Determination

Mr. Gonzalez's secondary argument focuses on the ALJ's determination that neither his nor his son's testimony was entirely credible. Both gentlemen testified that the claimant is essentially a changed person since the accident. Mr. Gonzalez told the ALJ that since the accident, his mind has been hazy, he suffers from debilitating headaches three or four times a week, takes multiple naps a day, and basically has no short-term memory. Tyson agreed, telling the ALJ that his father cannot function without notes that remind him what to do. But the ALJ found this testimony to be incredible, explaining that the statements concerning the intensity, persistence, and limiting effects of the claimant's symptoms was inconsistent with the evidence of record. We are not at liberty to

upset this determination unless we conclude it is not supported by substantial evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). After examining the record as a whole, however, we are persuaded that the ALJ's findings were "closely and affirmatively linked to substantial evidence" and hence free of legal error. *Id.* (quotation omitted).

Contrary to his hearing testimony, Mr. Gonzalez told his treating psychologist on numerous occasions that his headaches were helped significantly by medication and that he experienced no other pain. He reportedly could handle a number of household chores and walked daily up to two miles. More importantly, on multiple occasions, Mr. Gonzalez expressed an interest in returning to work. Dr. Kaplan's notes reveal he had trepidations about returning to construction work, but the very fact that he would consider such labor supports the ALJ's ultimate conclusion that he is capable of performing a limited range of unskilled light work. In our view, the ALJ's analysis of the objective medical findings combined with Mr. Gonzalez's statements to his treating physicians forms the necessary link between the evidence and the ALJ's credibility determinations.

## C. The ALJ's Treatment of the VE's Testimony

Finally, Mr. Gonzalez complains that the ALJ improperly formulated his RFC without considering the VE's testimony that all jobs would be eliminated for a hypothetical claimant who napped twice during the workday. For reasons just

explained, however, the ALJ justifiably concluded that Mr. Gonzalez's testimony was not entirely credible.  Therefore the ALJ was not obliged to accept this hypothetical as representative of the claimant's condition and committed no error in disregarding it for purposes of formulating Mr. Gonzalez's RFC.

The judgment of the district court is AFFIRMED.

Entered for the Court


John C. Porfilio
Circuit Judge