**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 17, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

MARTY C. GROBERG,

      Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, in his
capacity as Commissioner of the
Social Security Administration,

      Defendant-Appellee.

No. 09-4203
(D.C. No. 1:08-CV-00159-DAK)
(D. Utah)

_____

**ORDER AND JUDGMENT***

_____

Before **KELLY**, **ANDERSON**, and **TACHA**, Circuit Judges.

_____

Marty C. Groberg appeals from an order of the district court affirming the

Commissioner's decision denying his application for Social Security disability

and Supplemental Security Income benefits (SSI). Groberg filed for these

benefits on September 6, 2005. He alleged disability beginning May 22, 2002,

_____

* After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

due to chronic low back pain, degenerative joint disease in both of his knees, severe asthma, depression, and anxiety. The agency denied his applications initially and on reconsideration.

On November 20, 2007, Groberg received a de novo hearing before an administrative law judge (ALJ). The ALJ determined that he retained the residual functional capacity (RFC) to perform sedentary work with no mental restrictions and with the following physical restrictions:

- He can lift no more than five to ten pounds at any time.

- He must be permitted to sit or stand at will.

- He can sit for no more than one hour at a time.

- He can stand for no more than five minutes at a time.

Aplt. App. at 19.

The ALJ further found that Groberg could not return to his past relevant work, but that given his age, education, work experience, and RFC, there were a significant number of other jobs that he could perform in the national economy, including touch-up screener, semi-conductor bonder, and call-out operator. He had therefore not been under a disability from the alleged onset date through the date of the ALJ's decision. The Appeals Council denied review, making the ALJ's decision denying benefits the Commissioner's final decision.

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the

correct legal standards were applied. *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir. 1989) (quotations omitted).

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing process). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 n.2. If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains a sufficient RFC to perform work in the national economy, given his age, education and work experience. *See id.* at 751.

On appeal, Groberg argues that the ALJ (1) failed to evaluate properly his mental impairments; (2) improperly rejected the opinions of his medical providers; (3) failed to give adequate consideration to whether his physical impairments met or equaled a Listing; and (4) failed to meet his step-five burden to identify specific jobs, available in significant numbers, that Groberg can perform.

## I. Evaluation of Mental Impairments

At step two of the sequential analysis, the ALJ determined that Groberg had two severe impairments: chronic low back pain and bilateral degenerative joint

disease of the knees. He contends that the ALJ erred by failing to find that he also suffered from severe mental impairments.

The ALJ found at step two the alleged mental impairments (which he identified as anxiety, depression, and a personality disorder not otherwise specified) were medically determinable but non-severe. An error at step two concerning the severity of a particular impairment is usually harmless when the ALJ, as here, finds another impairment is severe and proceeds to the remaining steps of the evaluation. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). The real problem occurs later in the analysis, where the ALJ is required to consider the effect of *all* medically determinable impairments, severe or not, in calculating the claimant's RFC. *See* 20 C.F.R. § 404.1523 ("If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."); *id.* § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," . . . when we assess your [RFC]."). Thus, we turn to the issue of whether the ALJ properly evaluated the effect of Groberg's mental impairments in assessing his RFC.

The ALJ noted Groberg's testimony that due to his mental impairments "he has low motivation and never wants to leave the house because he experiences anxiety attacks in public." Aplt. App. at 21. After considering the medical evidence, however, the ALJ found that while "Mr. Groberg's medically determinable impairments could reasonably be expected to produce the alleged symptoms . . . his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* The ALJ therefore assigned no limitation at all due to these symptoms in calculating Groberg's RFC.

The ALJ's evaluation of the medical evidence concerning Groberg's mental impairments was seriously deficient and his analysis of them was therefore unsupported by substantial evidence. According to the extensive medical evidence in the record, Groberg has a long history of anxiety (including agoraphobia and panic attacks) and depression, secondary to abuse as a child. He may also be suffering from a personality disorder. There is also indication that he has a history of bipolar disorder. He has been hospitalized for depression in the past. In concluding that Groberg's mental impairments posed *no* limitation on his ability to work, the ALJ made the following unsupported findings:

1. The ALJ stated that "[t]he records throughout [the period of April to December] 2006 show *minimal or no [mental] symptomology at all*." Aplt. App. at 18 (emphasis added). On the contrary, the medical records reflect serious symptomology throughout this period:

On May 11, 2006, Groberg was seen by Donna L. Bush, LCSW. Her notes indicate that at that time he reported "an increase in frequency, severity and duration of [symptoms] of anxiety." *Id.* at 268. He described the anxiety as being "like feeling scared all of the time." *Id.* He was having panic attacks about two times a week and sometimes had to leave his AA (Alcoholics Anonymous) meetings because of them. *Id.*

On June 21, 2006, Dr. Angela L. Keane saw Groberg and noted that he "[r]eports mood as dysphoric with increased social isolation and difficulty getting out of bed." *Id.* at 266. She increased his prescription for Cymbalta, a medication used to treat depression and generalized anxiety disorder (GAD).

Ms. Bush saw Groberg again on June 29, 2006. Though she noted that he "maintain[ed] a routine of daily living that is effective in coping without the use of alcohol," she also noted that he reported "an increase in frequency, severity and duration of [symptoms] of anxiety and depression" and had "been isolating himself from others more frequently." *Id.* at 263.

Groberg continued to be seen regularly for mental health issues throughout the latter half of 2006. While his mood improved with the increase in his medication levels and he developed greater trust in his therapist, he continued to struggle with anxiety and depression during this period. On August 1, 2006, for example, he reported having recent suicidal ideation. *Id.* at 254. On August 15, 2006, he experienced panic symptoms in the therapist's crowded waiting room

severe enough to make him leave the room.  *Id.* at 252.  On October 18, 2006, Dr. Keane diagnosed him with Major Depressive Disorder, Recurrent, Moderate; Generalized Anxiety Disorder; Panic Disorder w/Agoraphobia; and Personality Disorder NOS.  *Id.* at 246.  On November 9, 2006, he reported that he was suffering from depression due to social isolation, the weather change, lack of money, and the holiday season.  *Id.* at 310.

2.  The ALJ concluded that "with few exceptions [Groberg's mental symptoms] have consistent[ly] been described as being of only minor severity." *Id.* at 17.  To reach this conclusion, however, the ALJ impermissibly picked and chose portions of the medical record favorable to his interpretation, while ignoring less favorable evidence.  *See Carpenter*, 537 F.3d at 1265 ("We have held that it is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.") (quotation omitted).  For example, the ALJ stated that in October 2005, "a treating physician found that all of [Groberg's] symptoms were mild, without any sign of anxiety."  *Id.*  While Dr. Keane's treatment notes of October 14, 2005 do show improvement in his mental status, *see id.* at 128, the same notes indicate that his "depressive symptoms continued with occasional suicidal ideation *until approx one week ago.  Over past week* mood has been significantly improved without suicidal ideation."  *Id.* at 130 (emphasis added).

*Two weeks later* Groberg was diagnosed as "currently depressed" with a GAF score of 45. *Id.* at 124.[1] His symptoms included Depressed Mood, Poor Apetite/Weight Change, Sleep Change, Hopelessness, Low Energy/Fatigue, Poor Concentration, Low Self-Esteem, Poor Concentration, Diminished Interest [in Life Activities], Psychomotor [Retardation], Worthlessness, Diminished Thinking, Death Thoughts, Restlessness, Fatigue, Concentration Problems, Irritability, Muscle Tension, Sleep Disturbance, Heart Palpitations, Sweating, Trembling, Chest Discomfort, Abdominal Distress, [Difficulties With] Impulse Control, and Impairment in Life Functioning. *Id.* at 123. It was noted that he was "Easily distracted" and "Often forgetful." *Id.* He was also suffering from a number of post-traumatic symptoms. *Id.* at 124.

Continuing with his selective reading of the evidence, the ALJ noted that in September 2005, Groberg's treating physician, Dr. Angela Keane, assessed him with a GAF score of 51, which according to the ALJ "indicates [only] a mild restriction in her [sic] ability to perform work activities." *Id.* at 17. First, the ALJ's interpretation of the GAF score is incorrect; a score in the 51 to 60 range

---

[1]   "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." *Pisciotta v. Astrue*, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quotation omitted). "A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job." *Id.* (quotation, brackets and ellipsis omitted).

reflects "moderate" not "mild" restrictions. *See, e.g., Wilson v. Astrue*, 602 F.3d 1136, 1142 n.3 (10th Cir. 2010). Second, the 51 score is at the bottom of the 51-to-60 range, closely approaching the 41-to-50 range that denotes serious impairment. Finally, the ALJ's naked reliance on the GAF score ignores Dr. Keane's narrative progress notes from the same appointment. Dr. Keane reported that Groberg stated he had no energy; slept only six hours per night; suffered from negative thinking, dysphoric mood, anhedonia, and poor concentration; and could read for only brief periods with poor retention of what he read. Aplt. App. at 141. His cessation of drinking alcohol had not improved his depressive symptoms. *Id.* She concluded that Groberg

> is a 45-year old, divorced white male with a family history of depression and substance abuse. [He] has experienced both alcoholism and depressive symptoms throughout his adult life. These have significantly affected his ability to function and maintain relationships. Response to antidepressants in the past has been rather poor, however, client has been drinking during trials of these medications. Prognosis is considered fair, if client is able to again maintain sobriety and continues to follow through with treatment.

*Id.* at 142.

The ALJ also claimed that Dr. Keane's conclusion that Groberg's symptoms were only mild was "reiterated the [sic] a few weeks later by two additional treating sources." *Id.* at 17. The two reports he cited do not support this conclusion, however. The first (Exhibit 5F, pp. 6-7, located at Aplt. App. at 123-24) includes a sort of checklist that appears to function on a zero-to-three

scale in terms of severity. Many of Mr. Groberg's ratings in this checklist are "two" or even "three." *Id.* at 123. This report also includes diagnoses for Mr. Groberg of Bipolar I with moderate depressed mood and an anxiety disorder. *Id.* at 124. Finally, the report assigns him a GAF score of 45, five points lower and in a lesser range of the GAF scale than that assigned by Dr. Keane. *Id.* Notably, this report on which the ALJ relied was completed by Donna L. Bush, LCSW, whose opinions the ALJ elsewhere indicated were entitled to no weight, in part because he found the GAF score of 45 she assigned to Mr. Groberg inconsistent with the other medical evidence. *See id.* at 23-24.

The other corroboration for Dr. Keane's conclusion advanced by the ALJ (Exhibit 5F, pp. 11-13, located at Aplt. App. at 128-30) is Dr. Keane's *own treatment record* of October 14, 2005, which as previously noted showed transient improvement in Groberg's mental symptoms. We note, first, that Dr. Keane is not an "additional treating source" to Dr. Keane. The two are *the same* treating source. Second, according to other evidence in the record we have already mentioned, this improvement was only transitory.

3. The ALJ's chronological assessment of Groberg's mental symptoms demonstrates a lack of familiarity with the record. For example, the ALJ claimed that in April 2006 Groberg alleged for the first time that he suffered from panic attacks while in crowds. Aplt. App. at 18. Dr. Richard Gregoire, however, had previously diagnosed him with panic disorder and anxiety with panic attacks *two*

-10-

*years earlier*, in April 2004. *See id.* at 106. On March 17, 2005, Sandie Johnson noted a diagnosis of panic disorder, without agoraphobia, for Groberg. *Id.* at 111. He was seen for treatment of "panic" on September 8, 2005. *Id.* at 144. While these earlier references to panic disorder do not specifically mention crowds as a trigger, they do demonstrate a long-standing problem with panic disorder. The ALJ downplayed this history in favor of his implied conclusion that the panic symptoms only appeared after Groberg applied for benefits.

4. The ALJ's analysis of the opinions of the treating physicians and other providers concerning Groberg's mental impairments appears erratic and result-oriented. Groberg saw an unusually large number of professionals concerning his mental problems, who ran the gamut from physicians to employment counselors. Their consensus was that he had serious mental impairments and needed treatment. The ALJ picked and chose among their opinions, apparently based solely on whether they had presented data that he could use to support his opinion that Groberg's mental impairments were not only non-severe but would create no restriction at all for purposes of his RFC.

In performing his analysis, the ALJ assigned *no weight* to five of these sources: Donna L. Bush, a licensed clinical social worker; Kathy Hart, an employment counselor; Mary J. Iverson, a licensed professional counselor intern; Sandie Johnson, a clinical social worker; and Virginia Mol, a family nurse

practitioner.  *Id.* at 23-25.[2]  In assigning no weight to these opinions, the ALJ

noted in each case that these were non-acceptable medical sources rather than

licensed physicians according to the regulations.  The ALJ gave great weight,

however, to the opinion of Sylvia R. Eyre, an examining licensed clinical social

worker who was also a "non-acceptable medical source."  *Id.* at 23.

The only virtue of Ms. Eyre's opinion that the ALJ mentioned was her

conclusion that Groberg's GAF score was 50, which he found consistent with the

other medical evidence.  A score of 50 lies within the 41-to-50 range, which

indicates "serious symptoms or serious impairment in social, occupational, or

school functioning, such as inability to keep a job."  *Pisciotta v. Astrue*, 500 F.3d

1074, 1076 n.1 (10th Cir. 2007) (quotation and alterations omitted).  Thus, even

the opinion of Ms. Eyre demonstrates that Groberg's mental impairments were

serious and likely to have some effect on his ability to work.[3]

The ALJ also gave controlling weight to the opinions of Dr. Angela Keane.

The only specific opinion of hers that he cited, however, was her conclusion that

Groberg's GAF score was 51.  Aplt. App. at 22-23.  When one examines the

report from Dr. Keane on which the ALJ relied, a more nuanced picture of his

_____

[2]     He also assigned no weight to the opinions of treating physician
Dr. Richard Gregoire, but only discussed and dismissed Dr. Gregoire's opinions
about Groberg's physical impairments.  *See* Aplt. App. at 24.

[3]     It should also be noted that the report in which Ms. Eyre assigned Groberg
a GAF of 50 was co-signed by Mary Iverson, whose opinions the ALJ gave no
weight.  Aplt. App. at 296.

mental condition emerges. As noted previously, Dr. Keane concluded that Groberg had suffered from depressive symptoms for most of his adult life and that his mental prognosis was only fair.

Subsequent events bore out Dr. Keane's guarded prognosis. Groberg did show some improvement as evidenced by Dr. Keane's treatment notes for the remainder of 2005. *See* Aplt. App. at 130, 214. On June 21, 2006, however, she noted that he suffered from dysphoric mood, increased social isolation, and difficulty getting out of bed. *Id.* at 266. He improved again when she saw him in July 2006, *id.* at 259, and she reported he was in a good mood when last she saw him in October 2006, *id.* at 248.

Beginning in January 2007, Dr. Keane was replaced in Groberg's treatment by a new MD/APRN, Dr. Angela L. Krahulec. Though Dr. Krahulec became his treating physician, the ALJ did not discuss her opinions in the medical assessment portion of his decision. It is notable that Dr. Krahulec's treatment notes are not so sunny as Dr. Keane's. She reported on January 17, 2007 that Groberg had an "increase in dysphoric mood [and] somnolence" relating to the winter season. *Id.* at 308. Residual symptoms of depression persisted, even though he took Cymbalta. *Id.*

Dr. Krahulec saw Groberg again on April 11, 2007. She noted that objectively speaking, he did not present as depressed, and he did not seem to have

many of the symptoms of depression, but he did report subjective symptoms of dysphoria and suicidal ideation. *Id.* at 291.

Things had taken a turn for the worse by the time Dr. Krahulec saw him again, in July 2007. He reported dysphoric mood with suicidal ideation, but stated "I would never do it because of my dog. He's more than a dog, he's my best friend." *Id.* at 284. Groberg reported difficulties with going to the store or accessing public transportation: "I get so nervous with my heart pounding and sweating that I just can't deal with it." *Id.* He had experienced weight loss and increased social isolation over a period of several months and she noted that he "[a]ppears to be experiencing panic with agoraphobia as well." *Id.* His symptoms were sufficiently serious that she ordered a thyroid study to rule out a physically based problem. *Id.* This is the last medical record from Dr. Krahulec.

Groberg reported increasing stress to his mental health providers from the denial of SSI benefits and his loss of Medicaid. In March 2008, less than a month after the ALJ's adverse decision, he suffered the first in a series of strokes. He was seen in the emergency room several months later, critically ill with altered mental status and respiratory failure. *Id.* at 340, 342. After this, the Commissioner awarded him SSI benefits, though not for the time period at issue in this case.

In sum, the ALJ's evaluation of Groberg's mental impairments is unsupported by substantial evidence. But this is not the only problematic aspect of his decision.

## II. Step Three Analysis of Spinal Disorder

Groberg argues that the ALJ failed to properly assess his chronic low back condition to determine whether it met Listing 1.04A for Disorders of the Spine. The ALJ found that "[w]hile Mr. Groberg does experience chronic back pain, there is no evidence of nerve root compression, spinal arachnoiditis, or pseudoclaudication." *Id.* at 19. One of these conditions must be present to meet the listing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A-C.

Groberg correctly notes that the ALJ did not discuss the specific medical evidence that caused him to reach the conclusion that Listing 1.04A was not satisfied. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (requiring ALJ to discuss evidence relevant to his listing conclusions). Such a discussion may not be essential in a situation where the ALJ relied on the *lack* of evidence to reach his conclusion (as here), and *there is in fact no evidence*. *See Birkinshaw v. Astrue*, 490 F. Supp. 2d 1136, 1143 (D. Kan. 2007) ("While the ALJ must explain his decision, he need not cite to affirmative evidence which proves plaintiff does not meet a listing. Here, [the ALJ] stated criteria of the listings which are *not* reflected in the evidence-thus demonstrating that plaintiff failed to meet her burden."). But where as here there *is* evidence that may meet

the listing requirements, the ALJ is required to provide a proper analysis. Otherwise, it is impossible to know how the ALJ weighed the evidence.

Turning to that evidence, various treating and examining physicians and health care personnel included radiculopathy (disease of the nerve roots) or herniated discs in Groberg's diagnosis. *See, e.g.,* Aplt. App. at 172, 187, 193. He also provided at least some indication that he met other requirements of the listing, including neuro-anatomic distribution of pain, *see id.* at 169, limited range of motion in his spine, *id.* at 102, motor loss, *id.*, sensory loss, *id.* at 101, and positive straight-leg raising tests, *id.* at 102, 187.

The Commissioner argues this evidence is insufficient to meet the listing requirement because the regulations require more support for such diagnoses than simple statements by the claimant, references to a history of prior testing, or therapeutic statements by a doctor. He cites a regulation requiring that

> [d]iagnosis and evaluation of musculoskeletal impairments should be supported, as applicable, by detailed descriptions of the joints, including ranges of motion, condition of the musculature . . ., sensory or reflex changes, circulatory deficits, and laboratory findings, including findings on x-ray or other appropriate medically acceptable imaging. Medically acceptable imaging includes, but is not limited to, x-ray imaging, computerized axial tomography (CAT scan) or magnetic resonance imaging (MRI), with or without contrast material, myelography, and radionuclear bone scans.

20 C.F.R., pt. 404, subpt. P, app. 1, 1.00C.1 (diagnosis and evaluation).

This regulation, however, imposes no absolute requirement of any particular form of proof where a claimant asserts that he meets a listing relating to

-16-

a musculoskeletal impairment. Moreover, the ALJ did not specifically rely on it or apply it to limit the value of the proof available here. Given the quantity of proof Groberg had adduced in this case, naked reliance on the regulation does not satisfy the ALJ's duty to properly analyze the evidence.

### III. Failure to Meet Step Five Burden

Groberg also argues that the ALJ's hypothetical question to the vocational expert, his RFC determination, and his conclusions about what jobs he could perform, all were flawed because they omitted certain impairments. In addition to improperly omitting his mental impairments as outlined above, he claims that the ALJ failed to include (1) a limitation that he could only sit forward with his elbows on his knees, and (2) a limitation that he could only read at a fifth-grade level. The Commissioner argues that the ALJ could have rejected both these limitations because they do not find adequate support in the record. Upon review, we agree with the Commissioner's position as to these issues.

### IV. Appropriate Remedy

"When a decision of the [Commissioner] is reversed on appeal, it is within this court's discretion to remand either for further administrative proceedings or for an immediate award of benefits." *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993). In deciding on the appropriate remedy, we consider both "the length of time the matter has been pending and whether or not 'given the available evidence, remand for additional fact-finding would serve [any] useful

purpose but would merely delay the receipt of benefits.'"  *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006) (alteration in original) (citation omitted) (quoting *Harris v. Sec'y of Health & Human Servs.*, 821 F.2d 541, 545 (10th Cir. 1987)).  In this case, an immediate award of benefits is appropriate.  It has been over five years since Groberg first applied for supplemental security income and disability benefits.  There is nothing to be gained from prolonging the proceedings any further.  According to the ALJ's own RFC analysis, Groberg is extremely limited in terms of his physical capacities.  Notwithstanding the ALJ's tendency to avoid the issue by misstating the evidence, the medical evidence points to a correspondingly debilitating set of mental impairments.  The VE testified that Groberg could not do even the few identified jobs if mental difficulties caused him to miss more than two days of work per month, or if he were mentally "off task" more than ten percent of the time.  Aplt. App. at 396.  Given a proper analysis and evaluation of his mental impairments, there is no reasonable probability that Groberg would be denied benefits.

**V. Conclusion**

The judgment of the district court is REVERSED and this case is REMANDED to the district court, with instructions to REMAND to the Commissioner for an immediate award of benefits for the relevant time period at issue in this case.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge