FILED
United States Court of Appeals
Tenth Circuit

April 9, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

LAURA DEFALCO-MILLER,

      Plaintiff-Appellant,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[*]

      Defendant-Appellee.

No. 12-1245
(D.C. No. 1:11-CV-00961-REB)
(D. Colo.)

**ORDER AND JUDGMENT**[**]

Before **LUCERO**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and
**MATHESON**, Circuit Judge.

Laura DeFalco-Miller appeals from a district court order that affirmed the

Commissioner's denial of supplemental security income (SSI) benefits. Exercising

jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

---

[*] In accordance with Rule 43(c)(2) of the Federal Rules of Appellate
Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant-
appellee in this action.

[**] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I. BACKGROUND

Ms. DeFalco-Miller suffers from bipolar disorder and anxiety attacks. At the time of the hearing in this case, she was forty-four years old. She has completed three years of college, is "two classes short of having two bachelor degrees in recreation therapy and hotel management," and has worked as a fast-food cashier. R. at 115, 224.

Musharraf Nizami, M.D., treated Ms. DeFalco-Miller's psychiatric conditions. During a March 2006 appointment, Dr. Nizami reported that she had rapid thinking, her concentration and mood were improving, her "[s]chool [was] going well," and she displayed "[n]o psychotic symptoms." *Id.* at 206.

At a May 2006 appointment, Dr. Nizami noted that Ms. DeFalco-Miller reported "[n]o depression" and was "[d]oing well[,] [but had] some mood irritability and difficulty [with] concentration." *Id.* at 205. In March 2007, Dr. Nizami reported that she exhibited rapid thinking and was anxious, had "[n]o psychotic symptoms," and had said she was continuing to go to school and was working "2 jobs." *Id.* at 203. At her next visit, in September 2007, Dr. Nizami noted she was "doing better." He reported no abnormal findings. *Id.* at 202. In December 2007, Dr. Nizami's examination of Ms. DeFalco-Miller revealed "periodic situational" depression. *Id.* at 201.

Ms. DeFalco-Miller applied for SSI benefits in February 2008. A state agency psychological consultant reviewed her medical records and concluded that her mental impairments were not severe and were only mildly limiting.

Ms. DeFalco-Miller continued seeing Dr. Nizami. At a March 2008 appointment, he noted she had a depressed mood but was otherwise normal.

In September 2008, Ms. DeFalco-Miller met with a licensed clinical social worker (LCSW), Laura Sales, for a psychiatric referral. Ms. Sales reported Ms. DeFalco-Miller's comments that her "bipolar [disorder] [was] managed with medications" and that her symptoms were "at a manageable level." *Id.* at 225. Ms. DeFalco-Miller did complain, however, of medication side effects. Ms. Sales rated Ms. DeFalco-Miller's GAF score as 55[1] and referred her to "psychiatric consult and group therapy." *Id.*

Ms. DeFalco-Miller sporadically attended therapy sessions conducted by LCSW Nicholas Rodriguez. He noted that she seemed to benefit from each session. Also, she resumed her appointments with Dr. Nizami. During an October 2008 appointment, Dr. Nizami adjusted her medications after noting that she exhibited an increased speech rate, rapid thinking, mood swings, and anxiety. In January 2009,

---

[1] "The GAF is a 100–point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012). A GAF score of 55 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* (quotation omitted).

- 3 -

Dr. Nizami again adjusted her medications upon observing an increased speech rate, but he noted "[n]o psychotic symptoms." *Id.* at 196. At a February 2009 session with Mr. Rodriguez, Ms. DeFalco-Miller reported that she was "feel[ing] more calm, less manicky and [that] her anxiety attacks [were] not as bad" as a result of the medication changes. *Id.* at 216.

Ms. DeFalco-Miller saw Dr. Nizami next in March 2009. He observed that she was mildly depressed and had rapid thinking, but she demonstrated no psychotic symptoms, and she mentioned going back to school.

In April 2009, Mr. Rodriguez completed a pre-printed mental RFC evaluation form for Ms. DeFalco-Miller, circling "marked" limitations in seven areas of work-related functioning and "extreme" limitations in thirteen areas of work-related functioning.[2] *Id.* at 210-11. Dr. Nizami signed the form two months later following an appointment with Ms. DeFalco-Miller. He noted rapid thinking and mood swings, but otherwise indicated that her speech rate, thought content, senses, memory, insight and judgment were essentially normal.

At a hearing before an ALJ, Ms. DeFalco-Miller testified that even when medicated, she has a fifteen-minute anxiety attack three to four times each day, and that during an attack, she could not accomplish anything. She further stated that while working as a fast-food cashier, her anxiety disorder prevented her from

---

[2] The form defines "marked" as a "[s]erious limitation[ ]" in which "[t]he ability to function . . . is severely limited but not precluded." *Id.* at 210. "Extreme" is defined as a "[s]evere limitation[ ]" which leaves "[n]o useful function." *Id.*

properly taking customers' orders, and she was fired. She admitted driving twice a week or as needed for doctor appointments and to pick up her medications, and that she could go grocery shopping by herself, but sometimes would have to leave before finishing.

The ALJ posed a hypothetical-claimant question to the attending vocational expert (VE) in which the claimant was "semi-skilled[ ] [and] subject to moderate limitations in the ability to maintain attention and concentration for extended periods, and subject to moderate limitations in the ability to respond appropriately to changes in the work setting." *Id.* at 40. According to the VE, such a claimant could perform Ms. DeFalco-Miller's past relevant work and other jobs in the national economy, such as electronics tester, demonstrator, construction flagger, cashier II, and small-products assembler.

In February 2010, the ALJ issued his decision, denying benefits.[3] He determined that Ms. DeFalco-Miller's bipolar disorder and anxiety were severe medical impairments, but they did not meet or equal any listed impairments. He then went on to formulate her RFC, giving "little weight" to the opinion of the state agency psychological consultant who had assessed all of Ms. DeFalco-Miller's difficulties as only mild. *Id.* at 12. The ALJ explained that the consultant had not examined Ms. DeFalco-Miller and that his opinion was inconsistent with the record

---

[3] In evaluating Ms. DeFalco-Miller's application for benefits, the ALJ followed the familiar five-step benefits-determination process. *See Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

evidence, including her GAF score of 55.  The ALJ concluded that the GAF score, in addition to "the medical evidence showing continued treatment with medications and therapy, as well as [Ms. DeFalco-Miller's] testimony at the hearing[,] . . . reflect[ed] [a] moderate degree of limitation." *Id.*

In setting her RFC to no more than moderate limitations, the ALJ discredited Ms. DeFalco-Miller's "statements concerning the intensity, persistence and limiting effects of [her] symptoms." *Id.* at 15.  He indicated that she "is able to live by herself and take care of her own personal needs," and that "the objective findings throughout the record, as well as [her] own reports that her condition is managed by her course of medication and therapy, fail to support a finding of disability." *Id.* at 15.

The ALJ fashioned an RFC for semi-skilled light work, subject to moderate limitations in (1) maintaining concentration and attention for extended periods and (2) responding appropriately to work setting changes.  In doing so, the ALJ gave "little weight" to Dr. Nizami's opinions on the mental RFC evaluation form.  He found Dr. Nizami's opinions (1) inconsistent with both his own treatment notes and his prescribed course of treatment, (2) lacking in objective findings, and (3) unsupported "by the relatively benign objective findings noted throughout the record." *Id.*

Finally, the ALJ found that, given her RFC, Ms. DeFalco-Miller could perform her past relevant work as a fast-food cashier, as well as the other jobs in the national economy identified by the VE.  Accordingly, the ALJ ruled that Ms. DeFalco-Miller

- 6 -

was not disabled, and the Appeals Council denied review.  Ms. DeFalco-Miller

unsuccessfully sought review in the district court, and then appealed to this court.

## II.  DISCUSSION

### A.  Standards of Review

"In reviewing the [Commissioner's] decision, we neither reweigh the evidence

nor substitute our judgment for that of the agency."  *Branum v. Barnhart*, 385 F.3d

1268, 1270 (10th Cir. 2004) (quotation omitted).  Rather, "[w]e review the

Commissioner's decision to determine whether the factual findings are supported by

substantial evidence in the record and whether the correct legal standards were

applied."  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).  "Substantial

evidence is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)

(quotation omitted).

### B.  Issues and Analysis

Ms. DeFalco-Miller advances three arguments against the Commissioner's

decision:  (1) the ALJ did not explain why he rejected eighteen of the twenty

limitations provided by Dr. Nizami on the RFC form; (2) the ALJ relied too heavily

on her GAF score; and (3) the ALJ failed to include within his RFC assessment a

limitation on social functioning.

### 1.  Treating-Physician Rule

Ms. DeFalco-Miller contends that the ALJ failed to explain why he did not accept eighteen of the mental limitations on the RFC form, which was completed by LCSW Rodriguez and later signed by Dr. Nizami. She suggests that the ALJ's RFC determination that she was moderately limited in her abilities to maintain concentration and attention for extended periods and to respond appropriately to work setting changes corresponds only to two of the twenty limitations on the RFC form. She concludes, then, that the Commissioner's decision must be reversed in light of *Chapo v. Astrue*, 682 F.3d 1285 (10th Cir. 2012), where this court observed that "an ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Id.* at 1292 (quotation and brackets omitted).

The premise of Ms. DeFalco-Miller's argument is flawed, however, as the ALJ did not rely on part of the RFC form while rejecting the rest. The ALJ gave "little weight" to the *entire* form. *See* R. at 15 (listing the four categories comprising all twenty limitation areas and "find[ing] [Dr. Nizami's] evaluation unpersuasive and accorded little weight"); *id*. at 12-15 (crafting an RFC with moderate limitations while noting that Dr. Nizami had indicated marked to extreme limitations for every area on the form). Moreover, as we discuss below, the ALJ adequately explained his reasons for discounting Dr. Nizami's opinions on the RFC form.

A "treating physician's opinion is given particular weight because of his unique perspective to the medical evidence." *Doyal v. Barnhart*, 331 F.3d 758, 762

(10th Cir. 2003) (quotation omitted). But an ALJ is not required to give controlling weight to the opinion of a treating physician if it is "not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." *Watkins*, 350 F.3d at 1300 (quotation omitted). In that case, "the ALJ must then consider whether the opinion should be rejected altogether or assigned some lesser weight." *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). Relevant factors for weighing a treating-physician's opinion include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1301 (quotation omitted); *see also* 20 C.F.R. § 416.927(c) (listing factors for weighing a medical opinion determined to be non-controlling).

Here, the ALJ recounted four reasons for giving little weight to Dr. Nizami's opinions on the RFC form. First, the ALJ pointed out that the opinions—which were that Ms. DeFalco-Miller had seven marked limitations in work-related functioning and thirteen extreme limitations—were inconsistent with Dr. Nizami's own treatment notes. The clearest example of this discrepancy comes from the notes Dr. Nizami authored the same day he signed the RFC form. In the notes, he indicated that while Ms. DeFalco-Miller exhibited rapid thinking and mood swings, and she was

- 9 -

essentially normal in regard to speech rate, thought content, senses, memory, insight, and judgment.  Ms. DeFalco-Miller identifies nothing in the record that would justify Dr. Nizami extrapolating the marked and extreme limitations identified on the RFC form from the treatment notes he authored the same day.  And there were three treatment notes in which Dr. Nizami reported no abnormal findings or only a depressed mood or periodic situational depression.  Further, Dr. Nizami repeatedly found no psychotic episodes.  We conclude that the ALJ correctly determined that the RFC form opinions were not consistent with Dr. Nizami's treatment notes.

Second, the ALJ observed that the RFC form is devoid of objective findings in support of the opined limitations.  The Commissioner's regulations on how opinion evidence will be evaluated provide that "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion."  20 C.F.R. § 416.927(c)(3).  Thus, the lack of objective findings was a permissible basis for the ALJ to discredit the RFC form's opinions.

Third, the ALJ stated that the "relatively benign objective findings noted throughout the record" did not support the opinions on the RFC form.  R. at 15.  The ALJ did not specify what objective findings he was referring to, and the Commissioner merely points again to Dr. Nizami's treatment notes.  We conclude that this ground is largely duplicative of the first ground cited by the ALJ and provides no additional support for the ALJ's rejection of Dr. Nizami's opinions on the RFC form.

- 10 -

Finally, the ALJ observed that Dr. Nizami's course of treatment for Ms. DeFalco-Miller belied Dr. Nizami's opined limitations. We agree. The record indicates that Ms. DeFalco-Miller saw Dr. Nizami roughly fourteen times over a forty-three month period primarily to adjust her medications, which, at least as of February 2009, had proven successful in improving her symptoms. And even if we consider Ms. DeFalco-Miller's attendance at LCSW Rodriguez's therapy sessions as part of Dr. Nizami's treatment protocol, Mr. Rodriguez reported that she seemed to be benefitting from the sessions. Apparently given Ms. DeFalco-Miller's improvement, Dr. Nizami did not pursue more invasive treatment options. Yet he signed off on the RFC form, agreeing with Mr. Rodriguez's prior assessments that Ms. DeFalco-Miller had marked or extreme limitations in every area. The course of Ms. DeFalco-Miller's treatment, however, casts doubt on those limitations.

We conclude that substantial evidence supports the ALJ's decision to afford little weight to Dr. Nizami's opinions on the RFC form.

2. **Ms. DeFalco-Miller's GAF Score**

Ms. DeFalco-Miller argues that the ALJ used her GAF score of 55 "to limit the restrictions in the [ALJ's] RFC finding to the moderate level of severity, as opposed to the marked or extreme levels rated by . . . Dr. Nizami." Aplt. Opening Br. at 14-15. She contends that this is problematic because (1) a GAF score "does not tend to prove which specific areas of mental functioning are impaired"; and (2) the ALJ

"did not state any reasons why [LCSW Sales's] opinion [setting Ms. DeFalco-Miller's GAF score at 55] deserves to outweigh Dr. Nizami's opinion." *Id.* at 15.

Ms. DeFalco-Miller's arguments misconstrue the ALJ's decision. Specifically, the ALJ cited the GAF score to discount *the state agency consultant's opinion* that Ms. DeFalco-Miller's limitations were only minor. And the ALJ used the GAF score, along with "the medical evidence showing continued treatment with medications and therapy, as well as [Ms. DeFalco-Miller's] testimony at the hearing" to set her RFC at a "moderate degree of limitation." R. at 12. In short, Ms. DeFalco-Miller's GAF score had nothing to do with the discounting of Dr. Nizami's opinions, and that score was only part of the evidence the ALJ cited for assigning an RFC of moderate limitations in the areas of concentration, attention, and responding to work-setting changes.

3. **Social Functioning Limitation**

Ms. DeFalco-Miller argues that the ALJ's RFC formulation was inadequate because it lacked a moderate limitation in social functioning. She points out that in finding her severe mental impairments did not meet or equal listed impairments that required, among other things, marked difficulties maintaining social functioning, the ALJ stated that she suffered "no more than . . . moderate difficulties" in that area.[4] *Id.* at 12.

---

[4] The ALJ considered paragraph B listings 12.04 and 12.06, which require at least two of the following: (1) marked restriction of activities of daily living;

(continued)

- 12 -

Ms. DeFalco-Miller fails, however, to identify a requirement that step three findings concerning the listings be incorporated into the RFC determination used in steps four and five. Indeed, Social Security Ruling 96-8p specifies that the findings are separate:

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires *a more detailed assessment* by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the [Psychiatric Review Technique Form].

SSR 96-8P, 1996 WL 374184, at *4 (July 2, 1996) (emphasis added); *see also* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(A) (indicating that the RFC assessment "is a multidimensional description" of retained work abilities that "complements the functional evaluation necessary for paragraphs B and C of the listings").

Further, an "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."

---

(2) *marked difficulties in maintaining social functioning*; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B). In addition to determining that Ms. DeFalco-Miller had no more than moderate difficulties maintaining social functioning, the ALJ further determined that she had no decompensation episodes, had only moderate difficulties maintaining concentration, persistence or pace, and was only mildly restricted in her daily-living activities.

- 13 -

SSR 96-8P, 1996 WL 374184, at *7.  But the ALJ's statement at step three that Ms. DeFalco-Miller exhibited "no more than" moderate difficulties maintaining social functioning is neither a medical fact nor nonmedical evidence.  And Ms. DeFalco-Miller does not argue that the record evidence, rather than the ALJ's step three statement, compels the inclusion of a moderate social-functioning limitation in the RFC.[5]

## CONCLUSION

The judgment of the district court is affirmed.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge

---

[5] Ms. DeFalco-Miller contends that *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007), requires that an ALJ's RFC determination correspond to the findings made at step three.  In *Frantz*, this court reversed the Commissioner's decision because the ALJ ignored evidence that would support a finding of disability while focusing on evidence that would support the contrary finding.  In remanding for additional proceedings, this court directed the Commissioner to consider "an inconsistency" between the ALJ's step three and step four findings.  *Id.* at 1303 n.3. In particular, the ALJ found "that [the claimant] ha[d] 'moderate difficulties in maintaining social functioning' and 'moderate difficulties in concentration, persistence and pace' when he considered whether her impairments met a listing at step three[,] [but] [h]e did not . . . include these moderate limitations in his later RFC determination."  *Id.* (citation omitted).  But *Frantz* did not hold that an ALJ is necessarily bound by his or her step three findings when fashioning a claimant's RFC.  And the court did not engage in any analysis on that issue.  Consequently, our decision today does not transgress the *Frantz* court's concern over the inconsistency it directed to be addressed on remand.